UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERTISA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>REPUBLIC OF HONDURAS,<br><br>Defendant. | Civil Action No.: 25-cv-00042 |

**AMENDED COMPLAINT**

Plaintiff, by and through its attorney, for and by its Amended Complaint against Defendant the Republic of Honduras alleges as follows:

**PRELIMINARY STATEMENT**

In early 2020, the COVID-19 virus caused a pandemic, creating a state of emergency worldwide. The Republic of Honduras ("Defendant" or "Honduras") was one of many countries ill-equipped to respond effectively to the crisis when it emerged. In an effort to address its need for additional medical facilities, Honduras, through its agents and instrumentalities, entered into contracts with Plaintiff VERTISA Corporation ("Plaintiff" or "VERTISA")—then known as "Elmed Medical Systems, Inc."—to purchase and secure on an emergency basis seven mobile hospitals. Plaintiff, working with Honduran officials, arranged for the manufacture of seven mobile hospitals at its affiliated factory in Ankara, Turkey. During their manufacture, Honduran officials even went to Turkey to inspect the process and the final product from its supplier. The terms of the purchase order contracts between Plaintiff and Defendant were "Ex Works," meaning Plaintiff was required only to make the hospitals available for shipping: the buyer—Honduras—agreed to arrange for and pay for transportation of the seven mobile hospitals from Turkey to Honduras.

Before the mobile hospitals were completed and ready for shipment, however, Honduras, again acting through its agents and instrumentalities, professed an inability to secure a logistics company to handle the shipping of the mobile hospitals from Turkey to Honduras. Honduran officials asked Plaintiff to undertake their shipping obligation and Honduras agreed to pay Plaintiff for all of the shipping costs Plaintiff would incur. Thereafter, in reliance on the promise of Honduras to repay Plaintiff for all of the shipping costs Plaintiff incurred, Plaintiff arranged for and paid for all seven mobile hospitals to be shipped from Turkey to Honduras. Plaintiff completed its promise to deliver all seven mobile hospitals to Honduras and the mobile hospitals were delivered to Honduran ports at different times in July, October, and November of 2020.

**Honduras accepted all of the hospitals** and installed them throughout Honduras. Nevertheless, Honduras has refused to pay for the shipping charges Honduras agreed to pay. The charges incurred by Plaintiff to ship the seven mobile hospitals from Turkey to Honduras amount to just under $2 million U.S. dollars.

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff VERTISA Corporation, is a corporation domiciled in Florida. Prior to November 9, 2020, VERTISA was known as "Elmed Medical Systems, Inc." and marketed its services to Spanish speaking countries over the Internet under the trade "HospitalesMoviles.com." Plaintiff was incorporated on about August 17, 1998, and it has been in continuous operation since then. At all times relevant to this matter, Plaintiff's headquarters and its principal place of business have been located in Orlando, Florida.

2. Defendant is the foreign state entity commonly known as the Republic of Honduras.

3. This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a) (Diversity) because Plaintiff and Defendant are citizens of different States and the amount

in controversy exceeds the sum or value of $75,000. Alternatively, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331(a) and the federal Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*

4. Furthermore, this Court retains subject matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* ("FSIA"), because the "commercial activities" exception to the FSIA removes a foreign state's immunity from suit in any case:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

5. This Court may exercise personal jurisdiction over Honduras because it transacted commercial business activities within the United States, including in the State of Florida and this action arises out of those commercial business activities. Plaintiff and Defendant, through their agents or instrumentalities, entered into various commercial business agreements, the terms of which are more fully set forth below, in Florida. The commercial business agreements were entered into with a Florida-based company while its officials were in Florida, the agreements contemplated some performance thereunder directed into and from Florida, and the agreements contemplated payment by Plaintiff from Florida to commercial shippers and repayment of the shipping costs from Honduras to Plaintiff's bank account in Florida.

6. In fact, as a result of the pandemic, no employee of Plaintiff went to, or was anticipated to go to, Honduras for completion of the commercial business projects; rather, the shipping contract formation was directed to Florida and the parties intended shipping to be coordinated from, and it was coordinated from, Florida. The material terms of the shipping

reimbursement arrangement were negotiated by Honduran officials with Plaintiff while Plaintiff was operating in Florida, the terms were approved by various Honduran officials during calls and communications directed into Florida, and were confirmed by follow-up communications with Honduran officials directed to and received in Florida. And, like the initial contracts to obtain seven mobile hospitals from Plaintiff, Honduran officials sought out Plaintiff, a U.S.-based company, because it was U.S.-based and because, unlike Honduras at the time, Plaintiff had access to international logistics companies. Honduras requested and understood that Plaintiff would advance its own funds from its U.S. sources and would use its relationships with international carriers to accomplish the transportation of the mobile hospitals.

7. Additionally or alternatively, this Court may exercise personal jurisdiction over Honduras because Defendant agreed to make its reimbursement payment in U.S. Dollars, into and through the U.S. banking system, just as it had previously made related payments (e.g., hospital purchase payments) in U.S. dollars to Plaintiff through U.S. correspondent banks. Defendant knew nonpayment would cause a cash-flow shortfall to a U.S. company because it had investigated with Plaintiff the costs of shipping and understood that costs were rising before it asked Plaintiff to undertake Honduras's shipping obligation and to front the shipping costs for Honduras.

8. Venue is proper in this judicial district because a civil action against a foreign state may be brought in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or in the United States District Court for the District of Columbia. *See* 28 U.S.C. § 1391(f).

## OPERATIVE FACTS

9. In about February and March of 2020, the Honduran government enacted

congressional laws declaring a state of emergency and allowing for accelerated direct contracting and acquisition of goods and services to respond to the global Coronavirus pandemic. The Honduran law allowed certain governmental agencies, including a Honduran agency known as "Invest-H," to contract directly with providers. In 2020, Mr. Marco Bogran was the Executive Director of Invest-H, and at all times relevant to this matter, he represented himself as having been appointed to handle Invest-H orders and to execute contracts on behalf of Invest-H and on behalf of Honduras, including contracts to obtain seven mobile hospitals from Plaintiff.

10. On about March 3, 2020, Mr. Porfirio Antonio Moreno Zavala, Military Attache to thew Honduran Embassy in Washington, D.C., made a call from the Washington, D.C. metropolitan area to Plaintiff VERTISA Corporation (then known as "Elmed Medical Systems, Inc."), in Orlando, Florida. Mr. Zavala, calling from a 240 (Maryland-based) area code told Axel Lopez, Plaintiff's co-owner and Chief Executive Officer, that he was a diplomate and an assistant within the foreign affairs ministry working at the Honduran Embassy in the United States. He said his country, Honduras, was looking to acquire mobile hospitals on an expedited basis and that he was aware of Mr. Lopez's company's capabilities through an Internet search for mobile hospital suppliers. After Mr. Lopez explained his company's capabilities, including its capability to source mobile hospitals on an expedited basis from a Turkish manufacturer, Mr. Moreno thanked Mr. Lopez and told him that someone from Honduras would be reaching out to him soon.

11. Thereafter, on March 16, 2020, Invest-H's Executive Director Marco Bogran made a call from Honduras to Orlando, Florida to inquire about acquisition of mobile hospitals and related medical equipment. During the March 16 call, Mr. Bogran represented himself to be the Executive Director of "Invest-H," which he said was a Honduran government entity charged with implementing and overseeing certain Honduran-government infrastructure projects, including

state-financed hospital projects.

12. On March 16, 2020, when Mr. Bogran spoke with Axel Lopez, Mr. Lopez was located in and running Plaintiff's operations from Orlando, Florida. Mr. Bogran introduced himself and explained to Mr. Lopez that Honduras was seeking information about acquiring mobile hospitals and that Honduras was interested in using Mr. Lopez's company to do that because it was U.S.-based. Mr. Bogran told Mr. Lopez that he also had learned about Plaintiff's involvement in the mobile hospital industry by searching over the Internet. Mr. Bogran explained that his searches led him to www.HospitalesMoviles.com, which is a trade name of VERTISA Corporation dully registered in Florida and a domain name owned by Plaintiff for over 10 years. The website outlined Plaintiff's capability to source mobile hospitals from a Turkish manufacturer. Mr. Bogran discussed with Mr. Lopez Honduras's current needs and discussions led to additional calls.

13. On March 17, 2020 Mr. Bogran called again requesting formal quotes from Plaintiff for its 51-bed mobile and 91-bed mobile hospitals.

14. Except for the March 13 and 14 calls to, Mr. Bogran was never the only Honduran official on the calls involving Plaintiff. Other Honduran government officials on the various status calls included, among others: (a) Esther Aleman (represented to be second in command of Invest-H); (b) Hector Herrera (represented to be Invest-H's attorney); (c) Ruben Reyes (represented to an Invest-H representative); (d) Sireya Diaz (represented as Invest-H's mobile hospitals project manager); (e) Natalie Boleres (represented to an Invest-H associate): (f) Gerardo Cerrato (represented as Invest-H's main engineer); (g) Ingrid Ordonez (represented as Invest-H's senior acquisition manager); (h) Hector Saga (represented to be an Invest-H associate); (i) Maria Isabel Perez (represented to be Invest-H's finance manager); (j) David Chavarria (represented to be Invest-H's Operations Manager); and (k) Lourdes Rodriguez (represented as Invest-H's Special

Projects Manager).

15. On March 18, 2020 Mr. Bogran and his Invest-H team, including Ms. Aleman (represented to be second in command of Invest-H), Ms. Diaz (Invest-H's mobile hospitals project manager), Mr. Cerrato (represented as Invest-H's main engineer), Mr. Herrera (represented to be Invest-H's attorney), and other Honduran officials participated in a teleconference with Plaintiff to review the quotes Invest-H had received and to inquire into what each quote entailed (included equipment, unit sizing, cite preparation, utility needs). On March 18, 2020, Invest-H officials indicated that it had requested funds for two 91-bed hospital projects.

16. Because Mr. Lopez had no prior relationship with Mr. Bogran or Invest-H, and because vendors manufacturing the mobile hospitals would require payments, Mr. Lopez told Mr. Bogran that Invest-H would have to pay for the hospitals up-front and he provided information for his company's Florida-based bank account into which Invest-H's pre-payment of the amount due under the contracts to manufacture mobile hospitals was to be made, and was made.

17. The communications with Plaintiff promptly led to an agreement for Honduras to purchase mobile hospitals from Plaintiff. Initially, on March 19, 2020 Invest-H told Plaintiff the funds for two 91-bed hospitals had been wired to Plaintiff's bank account in Florida. On about April 2, 2020, however, Honduran officials caused transfer of additional funds to secure two more 91-bed mobile hospitals, and three 51-bed mobile hospitals.

18. All of the Purchase Orders signed by a Honduran official clearly stated that the purchase prices quoted for each of the two mobile hospitals were "Ex-Works Factory," meaning that Honduras, as the buyer, was responsible for hiring and arranging for the pick-up, transfer, shipping and insurance of the product from the factory (in this case from a factory in Ankara, Turkey) to Honduras. In its pre-purchase discussions with Honduran officials, Plaintiff' also

explained that the prices Plaintiff quoted for 91-bed and 51-bed mobile hospitals did not include shipping.

19. After the required prepayments for the mobile hospitals occurred, much of the world went on lockdown and Invest-H officials reached back to Plaintiff, starting in early April of 2020, to report that Honduras was having difficulty arranging with any international logistics company for the transportation of the mobile hospitals to Honduras. Numerous Honduran officials participated in all of the telephonic meetings where Invest-H, though its officials, was reporting to Plaintiff that as a result of the pandemic Invest-H was having difficulty arranging for shipping. Plaintiff Mr. Lopez proceeded from Florida to engage in telephonic meetings with executives from DHL, with FedEx, with various airlines officials, as well as with Invest-H personnel and other Honduran government and military officials to coordinate with Honduras its efforts to manage the logistics for shipping mobile hospitals and equipment from Turkey to Honduras. Plaintiff even reached out to a Russian cargo company with the larges cargo plane in the world) to receive quotes for traveling from Ankara to a Honduran military base but its quote doubled overnight—to over one million dollars per flight—as international shipping came to a near-halt.

20. After Invest-H officials were told about these increasing calls, they asked Plaintiff if it would agree to arrange for the mobile hospital deliveries itself and *agree to provide the initial funding to the third party shipping entity it might secure*. Without any objection by the numerous Invest-H officials participating on each call subsequent to Mr. Bogran's two initial call, Invest-H, through Mr. Bogran and as confirmed by Gerardo Cerrato (who regularly provided translation for Honduran participants), promised Plaintiff it would reimburse Plaintiff for the additional transportation and delivery costs Honduras was asking Plaintiff to incur.

21. Before Plaintiff incurred shipping costs, during several follow-up calls with

Honduran officials, Honduran officials agreed that Honduras would pay Plaintiff for the costs it incurred to ship the mobile hospitals from Turkey to Honduras in the same manner it had paid for the hospitals: by wire-transfer of shipping costs into company's Florida-based bank account..

22. In reliance of the promises of Honduran officials to pay Plaintiff for the additional shipping costs the parties knew Plaintiff would incur, Plaintiff agreed to undertake the shipping/transportation obligations on behalf of Honduras, and agreed to finance the shipping costs. On about May 22, 2020, Plaintiff wired $1.5 million from its Florida-based bank account to an agent in Turkey who was assisting Plaintiff with shipping logistics. This was an estimated amount to cover the chartering of 2-3 ships.

23. Meanwhile, in August of 2020, three Honduran officials, including project manager Ms. Sireya Diaz, Erika Melendez (Secretary of the Ministry of Health), and Fernando Melendez (another Honduran government representative) traveled to the factory in Ankara, Turkey where the mobile hospitals were being fabricated. These officials reported to Plaintiff that they were there to inspect the product and to ensure the manufacturing process was moving forward expeditiously as intended, with the offered medical equipment included. Honduran officials did not object to the product they inspected in Turkey; nor did they seek to make any changes to the mobile hospitals or to the purchase orders between Plaintiff and Defendant. While in Turkey, the Honduran officials present there did not request any changes to the hospitals or to paying Plaintiff for coordinating their shipping.

24. Relying on Honduran officials' promises to reimburse Plaintiff for all costs Plaintiff incurred in shipping the mobile hospitals from Turkey to Honduras, Plaintiff arranged for, and paid all costs for, shipping the seven mobile hospitals to Honduras.

25. On or before October 7, 2020, Plaintiff caused all of the hospitals to be delivered

to Puerto Cortez, Honduras. The hospitals were delivered in July, October and November of 2020 by three commercially-chartered ships.

26. The updated costs of handling, transporting, inspections, port transfers, declarations, shipping and insurance for transferring seven mobile hospitals from the factory in Ankara, Turkey to Puerto Cortez, Honduras, in three different ships, was $1,681,486.00 + $290,634.54 insurance for a total of $1,972,121.54 U.S. Dollars.

27. After three separate companies using three chartered ships were paid to transport the seven mobile hospitals to Honduras, Plaintiff presented its invoice for repayment of the shipping and insurance costs to Invest-H. By then, however, Plaintiff had already been told that Mr. Bogran was no longer affiliated with Invest-H and Plaintiff had been directed by three newly-appointed Invest-H Commissioners to communicate with one of three newly-appointed commissioners managing Invest-H: Mr. Jose Gustavo Boquin. Honduran government officials had announced, as of about late July of 2020, that Mr. Boquin was one of three new commissioners installed by the government of Honduras to manage Invest-H.

28. Initially, Invest-H Commissioner Boquin told Plaintiff reimbursement would occur once all of the hospitals were delivered to their port: Puerto Cortez, Honduras.

29. After Plaintiff was told that three commissioners were now running Invest-H, news that Mr. Bogran was under investigation for having steered one or more contracts to family members; however, *not before April of 2021* did Plaintiff discover—after Mr. Bogran's indictment for procurement improprieties became public—that Mr. Bogran also was alleged to have engaged in improper mobile hospital procurement.

30. In October of 2020, Plaintiff sent invoices for shipping changes to Mr. Boquin in Honduras via DHL. Ms. Rodrigues, Mr. Bogran's assistant, told Plaintiff that its shipping charges

invoices would now be paid after completion of the installations of the seven mobile hospitals in Honduras, per Mr. Boquin's (new) instructions.

31. In a media interview of Mr. Boquin that was broadcast in December, 2020, Mr. Boquin confirmed that all seven mobile hospitals had been delivered. He explained that two of the seven hospitals remained to be installed, and he indicated that their installations would occur in February and March of 2021 and that the hospitals would be turned over to the Health Ministry.

32. In phone call Mr. Lopez had with Mr. Boquin in early January, 2021, Mr. Lopez reminded Mr. Boquin of Plaintiff's outstanding shipping/insurance charges invoice. Mr. Boquin told Mr. Lopez that Invest-H's new administration would now be processing the pending invoice.

33. Thereafter, Mr. Lopez reached out to Invest-H officials on several occasions. Throughout January of 2021, Ms. Lourdes Rodriguez confirmed that Mr. Boquin was aware of Plaintiff's request for reimbursements and, she said, Invest-H was looking in the matter.

34. On January 28, 2021, Silvya Cruz, the executive assistant to the commission then running Invest-H, sent an email to Axel Lopez. In the body of her email, Ms. Cruz wrote (in Spanish): "I hereby submit a Claim Note for breach of contract in relation to the purchase process of 7 mobile isolation hospitals." Attached to Ms. Cruz's email was a six-page double-spaced PDF letter, also written in Spanish but not set forth on any official letterhead. Each of the three commissioners then running Invest-H purportedly signed the email's PDF attachment on January 10, 2021. The PDF attachment was named (but again in Spanish): "Complaint Note to Supplier Elmed Medical Systems, Inc." (hereinafter: "Claim Note").

35. On about March 18, 2021, Plaintiff received a translated "Claim Note." This time, however, the Claim Note Honduran officials sent (by email) to Plaintiff was set forth on Invest-H letterhead. The date of the English-version Claim Note sent on Invest-H letterhead continued to

reflect its having been signed by Invest-H's Commissioners on January 10, 2021 even though Defendant did not send any letterhead version of the Claim Note until about March 18, 2021.

36. In the Claim Note Invest-H's Commissioners acknowledged that "[d]ue to the Sanitary and Humanitarian Emergency decreed by the Government of the Republic of Honduras, the purchase of Isolation Hospitals was required to care for the infected with the COVID-19 virus" and that, as a result, Invest-H contracted with Elmed Medical Systems, Inc. to purchase seven mobile hospitals. In its Claim Note, signed by Invest-H Commissioners Jose Leva, Jose Boquin, and Jose Benitez, Invest-H complained that Plaintiff "failed to comply with several provision of the Contract, for which is caused damage to INVEST-H in particular, and to the State of Honduras in general." In short, in its 2021 Claim Note Invest-H's three Commissioners agreed that as of 2020 valid contracts with Plaintiff involving mobile hospitals existed.

37. In the Claim Note Invest-H's Commissioners also confirmed that Honduras had received all seven of the mobile hospitals that were manufactured in Turkey.

38. In the Claim Note Invest-H's Commissioners did not dispute or otherwise challenge Plaintiff's assertion that Honduras had agreed to reimburse Plaintiff for the costs of shipping the mobile hospitals from Turkey to Honduras.

39. In the Claim Note Invest-H's Commissioners did not dispute or otherwise challenge the amount Plaintiff alleged it was due from Honduras for having shipped the mobile hospitals from Turkey to Honduras.

40. In the Claim Note Invest-H's Commissioners enumerated twenty-two other complaints concerning the mobile hospitals Honduras purchased from Plaintiff.

41. For example, in their Claim Note the Invest-H's Commissioners said the mobile hospitals did not come with spare parts—even though Invest-H did purchase spare parts as part of

its contract with Elmed Medical Systems.

42. For example, in their Claim Note Invest-H's Commissioners protested that Plaintiff did not comply with its obligation to install the mobile hospitals in Honduras even though the Honduras—not Plaintiff—had initially assumed not just the obligation to transport the hospitals from Turkey to Honduras, but also the obligation to install the mobile hospitals at whatever locations Honduras might select.

43. A true and accurate copy of the Claim Note signed by the three Commissions tasked by the government of Honduras to manage Invest-H throughout the first quarter of 2021, and transmitted to Plaintiff in March of 2021 (as translated by Honduras), is attached as **Exhibit A**.

44. On about April 27, 2021, Plaintiff responded to the Invest-H Commissioners' Claim Note with a sixteen-page single-spaced letter (not counting attachments). Plaintiff refuted each allegation that it had breached its contractual obligations, expressed its willingness to work with Honduras to meet its reasonable requests, and again reminded Invest-H's officials of their promise to pay all of the shipping costs.

45. A true and accurate copy of the written response Plaintiff provided to Invest-H on about April 27, 2021 is attached as **Exhibit B**.

46. Neither Invest-H, nor any other Honduran government entity official, responded to Plaintiff 's April 27, 2021 response to the Claim Note.

47. To date, Honduras has not made any payment whatsoever toward satisfaction of the promises its officials made in 2020 to reimburse Plaintiff for all costs Plaintiff incurred in shipping the seven mobile hospitals from Turkey to Honduras.

**COUNT I**
(Breach of Contract)

48. Plaintiff incorporates by reference all allegations contained in Paragraphs 1-47 of

this Complaint as if stated at length herein and alleges further:

49. Plaintiff and Defendant entered into one or more valid and enforceable agreements—whether as a separate reimbursement agreement, a modification of the parties' existing contractual relationship, or an otherwise binding agreement—pursuant to which Defendant agreed to reimburse Plaintiff for all costs Plaintiff incurred in arranging, financing, and effectuating the transportation, insurance, handling, and delivery of seven mobile hospitals from Ankara, Turkey to Puerto Cortez, Honduras.

50. The agreement governing reimbursement of shipping and related costs was distinct from, and supplemental to, the original purchase orders for the manufacture of the mobile hospitals, which expressly allocated shipping responsibility to Defendant on an Ex Works basis.

51. Defendant, through its authorized officials and agents, expressly requested that Plaintiff assume Defendant's shipping obligations and promised that Defendant would repay Plaintiff for all shipping and related costs Plaintiff incurred.

52. Plaintiff fully performed its obligations under the reimbursement agreement by arranging and paying for all shipping, insurance, handling, and delivery costs and by ensuring that all seven mobile hospitals were delivered to Honduras.

53. Defendant breached the reimbursement agreement by failing and refusing to pay Plaintiff the amounts due, despite Defendant's acceptance and use of the mobile hospitals and Defendant's repeated assurances that payment would be made.

54. As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages in an amount not less than **$1,972,121.54**, plus interest.

**COUNT II**
(Unjust Enrichment)

55. Plaintiff incorporates by reference all allegations contained in Paragraphs 1–47 of

this Complaint as if fully set forth herein.

56. This claim is pleaded **in the alternative** to Count I pursuant to Federal Rule of Civil Procedure 8(d). Plaintiff brings this claim only to the extent the Court determines that no valid, enforceable, or binding contract governs Defendant's obligation to reimburse Plaintiff for the shipping, transportation, insurance, and delivery costs incurred in transporting the seven mobile hospitals from Ankara, Turkey to Puerto Cortez, Honduras.

57. Defendant knowingly requested, induced, and accepted a benefit from Plaintiff, including Plaintiff's advancement and payment of nearly $2 million in third-party shipping, logistics, handling, insurance, and delivery costs that Defendant was otherwise obligated, but claimed itself unable, to undertake.

58. Plaintiff conferred this benefit directly on Defendant by arranging and paying for the shipment of all seven mobile hospitals from Florida and at Defendant's request, thereby enabling Defendant to receive, take possession of, install, and use the mobile hospitals throughout Honduras.

59. Defendant had actual knowledge of the benefit conferred. Multiple Honduran officials, acting on behalf of Defendant, expressly requested that Plaintiff assume Defendant's shipping obligations and promised that Defendant would reimburse Plaintiff for all costs incurred.

60. Defendant accepted and retained the benefit by taking delivery of all seven mobile hospitals, incorporating them into Defendant's public health infrastructure, and retaining the full value of Plaintiff's expenditures without payment.

61. To the extent Defendant contends that no enforceable contract exists governing reimbursement of the shipping costs—or that any such agreement is unenforceable, unauthorized, void, ultra vires, or otherwise nonbinding—Defendant nevertheless knowingly accepted and

retained the benefit of Plaintiff's performance under circumstances that make it inequitable for Defendant to retain that benefit without compensating Plaintiff.

62. Defendant's retention of the benefit without payment violates fundamental principles of equity and good conscience, particularly where Plaintiff acted at Defendant's request and Defendant obtained a direct and substantial benefit with a direct financial effect in the United States.

63. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff has suffered damages in an amount not less than **$1,972,121.54**, plus interest.

**COUNT III**
(Quantum Meruit)

64. Plaintiff incorporates by reference all allegations contained in Paragraphs 1–47 of this Complaint as if fully set forth herein.

65. This claim is pleaded **in the alternative** to Counts I and II pursuant to Federal Rule of Civil Procedure 8(d), and only to the extent the Court determines that no valid or enforceable contract governs Defendant's obligation to reimburse Plaintiff for the shipping, transportation, insurance, handling, and delivery of the seven mobile hospitals.

66. At Defendant's request, Plaintiff rendered substantial and valuable services to Defendant, including but not limited to coordinating international logistics, arranging and financing maritime transportation, procuring insurance, managing port handling and inspections, and ensuring timely delivery of seven mobile hospitals from Ankara, Turkey to Puerto Cortez, Honduras.

67. Plaintiff rendered these services with the reasonable expectation of payment, and Defendant knew or should have known that Plaintiff expected to be compensated for the services rendered.

68. Defendant knowingly accepted and benefited from Plaintiff's services by taking delivery of all seven mobile hospitals, incorporating them into Defendant's public health infrastructure, and avoiding the cost and burden of performing the shipping and logistics services itself.

69. Despite Defendant's acceptance and use of Plaintiff's services, Defendant has failed and refused to pay Plaintiff the reasonable value of those services.

70. The reasonable value of the services Plaintiff rendered to Defendant is not less than **$1,972,121.54**.

71. Under the circumstances, Defendant's retention of the benefit of Plaintiff's services without payment is unjust and inequitable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Vertisa Corporation respectfully requests this Court enter judgment in its favor and against Defendant, the Republic of Honduras, and award the following relief: judgment in its favor and against Defendant, the Republic of Honduras, and award the following relief:

A. On Count I (Breach of Contract):

An award of compensatory damages in an amount to be proven at trial, but not less than **$1,972,121.54**, representing the unpaid shipping, transportation, insurance, handling, and delivery costs Defendant agreed to reimburse, together with pre- and post-judgment interest as allowed by law;

B. In the Alternative, On Count II (Unjust Enrichment):

To the extent the Court determines that no valid or enforceable contract governs Defendant's obligation to reimburse Plaintiff for the shipping and related costs, an award of

restitution or disgorgement in an amount not less than **$1,972,121.54**, together with pre- and post-judgment interest as allowed by law;

C. In the Further Alternative, On Count III (Quantum Meruit):

To the extent the Court determines that no valid or enforceable contract governs Defendant's obligation to reimburse Plaintiff and that unjust enrichment does not supply a basis for recovery, an award of the reasonable value of the services Plaintiff rendered at Defendant's request, in an amount not less than **$1,972,121.54**, together with pre- and post-judgment interest as allowed by law;

D. Costs and Interest:

An award of Plaintiff's taxable costs, together with pre-judgment and post-judgment interest as permitted by applicable law;

E. Such Other and Further Relief:

Such other and further relief as the Court deems just and proper.

Respectfully submitted,

VERTISA CORPORATION

By: *s/ William R. Cowden*

William R. Cowden
DC Bar #426301
WILLIAM COWDEN LLC
2503D N. Harrison Street, #1127
Arlington, VA 22207
(202) 642-0209
wcowden@cowdenllc.com
*Counsel for Plaintiff VERTISA Corporation*

Inversión Estratégica de Honduras

Exhibit A

**Mr. Axel López**

Elmed Medical Systems Inc. / HospitalesMoviles.com

Your office.

***Ref***.: *Notice of claim for non-compliance of contract regarding the purchase of Mobile Hospitals*

**Mr. López:**

**A.- Background**

Due to the Sanitary and Humanitarian Emergency decreed by the Government of the Republic of Honduras, the purchase of Isolation Hospitals was required to care for the infected with the COVID-19 virus. For this purpose, Elmed Medical Systems Inc. / HospitalesMoviles.com (the company, the provider) submitted an offer detailing the products and supplies that it undertook to provide for the subsequent assembly of the Mobile Hospitals that would serve to attend the emergency.

In this sense, on March 18, 2020, a Purchase Order was issued for the acquisition and installation of two 91-bed mobile hospitals at a cost of US $ 15,900,000.00, amount which was paid in advance 100% of the value of the Purchase Order.

Subsequently, on April 2, 2020, a new Purchase Order was issued for US$ 31,562,500.00, which included one 91-bed mobile hospital, four 51-bed mobile hospitals beds and seven medical waste treatment plants, an amount that was paid in advance 100% of the value of the Purchase Order.

**B.- Legal Basis**

This contractual relationship is framed by the internal legislation of the Republic of Honduras, the regulations governing *Inversión Estratégica de Honduras* (INVEST-H) and the United Nations Convention on Contracts for the International Sale of Merchandise (the Convention), which regulates the rights and obligations of the parties.

In addition, it is a general principle of law - recognized by our legislation - that what is agreed between the parties legally binds them, so the commitments acquired in the current relationship of sale must be respected by the parties.

In that order of ideas, INVEST-H fulfilled its obligation to pay the price (contained in Article 53 of the Convention), and despite this, your company failed to comply with several provisions of the Contract, for which it caused damage to INVEST-H in particular, and to the State of Honduras in general.

**C.- Non-compliance**

On several occasions, INVEST-H has progressively communicated the findings in relation to the defects, inaccuracies, and damages that the Mobile Hospitals have presented, as well as the unfulfillments in which your company has incurred. However, it has not been possible to achieve a response on your part in which you indicate precisely what actions your company will carry out to correct the damages and harms caused, and to comply with the agreement.

Next, we reiterate a detail of the non-compliance and damages that we have identified to date, without prejudice that they can be expanded as more flaws are discovered.

*1. The provision of mechanical ventilators for 2 mobile hospitals with 91 beds located in the City of San Pedro Sula and Tegucigalpa. These ventilators should have been 22 for San Pedro Sula and 22 for Tegucigalpa, for a total of 44 ventilators.*

*2. 44 used anesthesia machines arrived, of which 22 are in San Pedro Sula and 22 in Tegucigalpa. These were not requested.*

*3. There was no technical personnel from the supplier for the assembly and installation of all equipment and systems of mobile hospitals. This was offered by the supplier to guarantee the installation.*

*4. Lack of supplies for the installation of equipment and systems:*
*→ 2 USB sticks required by X-ray machines for the hospital of Tegucigalpa, there are three in total, only one came. These USB sticks are keys to access the equipment.*
*→ 3 hoses from the medical gas network, 1 for oxygen, 1 for vacuum and 1 for medicinal air, in the resuscitation area.*
*→ USB cables of 5 Printers brand HP model LASER 107 of the Mobile Hospital of Tegucigalpa.*
*→ 34 pressure gauges.*
*→ 1 UV Lamp for Mobile Hospital Water Treatment Plant of Tegucigalpa.*

*5. Lack of technical and user manuals for systems and equipment, which must come in Spanish and / or English:*
*→ Water purification plant*
*→ Oxygen generating plant*
*→ Medicinal gas plant*
*→ Bio-infectious waste plant*
*→ Air conditioning system with HEPA filters*
*→ Generators manual*
*→ Electrical system*
*→ Electric stove*
*→ Stationary X-ray*
*→ Portable X-rays*
*→ Secretion suckers*
*→ Chemistry analyzer (laboratory equipment)*
*→ Hematology analyzer (laboratory equipment)*

*6. Lead vests and collars, for all mobile hospitals, verified in Tegucigalpa and SPS.*

*7. There is a missing Computer (CPU, Monitor, mouse) and printer for the computer chemistry in the laboratory area, brand BIOBASE MODEL BK 200 mini*

*8. The air conditioning system has a design deficiency, due to the fact that the condenser does not have the cooling capacity for the whole room, also the room presents problems for the negative pressure cycle to be fulfilled, which according to hospital standard should be -10pa and according to tests carried out in the wards present results from -4 to -6pa, therefore, the rooms do not comply with the tightness required to function properly.*

*9. UPSs were not registered within the hospitals, however according to the plan they appear included, the said electrical equipment is essential for an uninterrupted electrical flow within the hospital.*

*10. Neither spare parts nor accessories were provided for the electrical, mechanical, and biomedical systems.*

*11. Due to a thermographic study, hot spots were detected within the inputs and outputs of the pedestal-type transformer, resulting in that due to upon overheating, there will be continuous overload trips, causing material losses in biomedical equipment and shortening their effective usage time.*

*12. Within the main voltage regulator of each hospital, no display screen was included for tension adjustment, which allows us to adjust the output voltage of the voltage regulator.*

*13. At the Hospital of San Pedro Sula it was detected that one of the dual transfer switches was in bad condition, so it was replaced with the switch of the dual transfer of the Hospital of Choluteca, so as not to stop the operation of the facility that was already providing care.*

*14. The internal coils of one of the main switches of the dual transfer were damaged, so the coils from the Hospital of Choluteca coils were used.*

*15. The times of the dual transfer within the modular hospitals amount to 45 seconds, as the UPS does not exist, the hospital is without power for 1 minute, requests to adjust said transfer to shorter times.*

*16. The supports for the Choluteca and Santa Rosa generators were in poor condition.*

*17. The X-ray section and the Oxygen plant do not come inside the main feeder's package, at the Hospital of Santa Rosa.*

*18. Lack of architectural, plumbing and electrical network plans for the Mobile Hospitals.*

*19. Regarding the guarantee of medical and non-medical equipment and systems, it has not been received yet from the supplier.*

*20. Lack of architectural, plumbing and electrical network plans for Mobile Hospitals.*

*21. In the Modular Hospital of Tegucigalpa, 5 damaged lecterns were found, the tubes bottoms are cracked.*

*22. Tests of the oxygen generating plant were carried out to verify the operation and verify its ability to maintain oxygen concentration and working pressure, with a high demand, taking into account that the hospital has installed 88 oxygen intakes.*
*The tests consisted of connecting mechanical ventilators at a flow of 50 Lt / min and at 100% oxygen concentration:*
*By connecting 5 ventilators, it was identified that the pressure dropped from 4.5 bars to 2.5 bars and the oxygen concentration dropped from 100% to 89% during 13 hours of continuous operation, this happened as transfer tests were done with generators, in this range of*

*hours.* ***Whenever there is a power cut, the plant takes 20 minutes to generate oxygen again and when power is restored, the plant fails to reach the required values to continue therapy with which the ventilators were programmed initially.***

*Tests were also made with 10 and 20 mechanical ventilators, it was identified that pressure and oxygen concentration decreased during the first 30 minutes.*

***It is concluded that the oxygen generating plant does not have the capacity to work with high flow mechanical fans.***

In addition to the above, defects were found that have not allowed the proper operation of the Hospitals, so that, despite INVEST-H's efforts to start them up, they have faced difficulties due to:

*1. Electrical:*

*a. There is no uninterrupted backup system;*

*b. There are several hot spots for potential electrical failure due to increased temperature;*

*2. Air conditioning:*

*a. Air conditioning is not met for certification;*

*b. Orifices on false ceiling;*

*c. Low negative pressure;*

*d. Lack of pre-filters in the extraction of the system;*

*e. Mini Split negatively alter the circulation of the particles;*

*f. There is no monitor to measure negative pressure;*

*g. Defective sealing in the filter mounting structure;*

*3. Biomedical:*

*a. Oxygen purity reduction;*

*b. Design of the X-ray Room does not comply with the regulations;*

*c. Lack of X-ray room signage;*

*d. Bad location of the autoclave and flow problem;*

*and. Lecterns in poor condition;*

*F. Lack of sinks;*

*g. Limitations in the turn for access of stretchers;*

**D.- Claim**

From the above it can be deduced that your company not only did not comply with the Contract and applicable legal framework from the moment that the mobile hospitals presented delays in relation to the days that were agreed to be produced and delivered, and also that, once they arrived to the country, they presented damages, defects, lack of supplies and technical support, that was part of the contract as obligations of your company to supply them, and that, in the end, has delivered a product that deviates from the conditions that your company offered and it therefore hinders its use and implementation in a correct manner.

INVEST-H
Inversión Estratégica de Honduras

Exhibit A

For this reason, you are hereby **required** to **notify** *Inversión Estratégica de Honduras* within the next five calendar days, of the measures your company will take to comply with the obligations that are acquired contractually and legally with this Institution.

This claim note constitutes a formal claim to your company for contractual non-compliance, without leaving out the possibility of legal actions that the State of Honduras may take through its internal and external legal representation.

Tegucigalpa, MDC, January 10, 2021

COMISION INTERVENTORA INVEST-H Inversion Estrategica de Honduras JOSE LEVA

**José Ernesto Leva Bulnes**
President of the Intervention Board
INVEST-H

COMISION INTERVENTORA INVEST-H Inversion Estrategica de Honduras JOSE BENITEZ

COMISION INTERVENTORA INVEST-H JOSÉ BOQUÍN

**José Alberto Benítez Portillo**
Member of the Intervention Board
INVEST-H

**José Gustavo Boquín Suarez**
Member of the Intervention Board
INVEST-H

Exhibit B

HospitalesMoviles.com
MobileHospitalsUSA.com

3956 Town Center Blvd. 217
Orlando, Florida 32837
(407) 852-8277
info@hospitalesmoviles.com

April 27, 2021

**VIA EMAIL**

Ing. Jose Ernesto Leva Bulnes
President of the Intervention Board
INVEST-H

Ing. Jose Alberto Benitez Portillo
Member of the Intervention Board
INVEST-H

Ing. Jose Gustavo Boquin Suarez
Member of the Intervention Board
INVEST-H

Dear Messrs. Leva, Benitez and Boquin,

Thank you for your letter dated January 10, 2021 to HOSPITALESMOVILES.COM (hereinafter "HM" or "we"). We have sought technical guidance from Vertisa Cevre Tek. Ltd.Sti (hereinafter "Vertisa" or "supplier"), HM's supplier, in preparing our responses. Because the enclosed English version of your letter, attached hereto as Exhibit A, was only received by us on or about March 18, 2021, we were unable to respond sooner. However, to respond to your letter in as timely of a manner possible, we have decided to limit the scope of this response to addressing section "**C.- Non-compliance**" and look forward to the opportunity of addressing sections "**A.- Background**," "**B.- Legal Basis**," and "**D.-Claim**" in subsequent correspondence. We are hopeful that the responses herein will be helpful in assisting you in fully utilizing the remarkable mobile hospitals and accompanying equipment you received last year from the supplier.

To assist with responding to your claims stated therein, below please find excerpts from your letter and the respective responses thereto.

**CLAIM BY INVEST-H:**

> ***"On several occasions, INVEST-H has progressively communicated the findings in relation to the defects, inaccuracies, and damages that the Mobile Hospitals have presented, as well as the unfulfillments in which your company has incurred. However, it has not been possible to achieve a response on your part in which you indicate precisely what actions your company will carry out to correct the damages and harms caused, and to comply with the agreement."***

**RESPONSE:**

Please know that we consider ourselves to be very customer service oriented and believe the same to be of all individuals and parties with whom we do business. Therefore, we find your claim of experiencing less than satisfactory responses to be concerning and something we want to review in more detail and respond to, if warranted. Notwithstanding this, however, please know that we believe our responsiveness has been excellent, as well as the responsiveness from Ecomac S.A., etc. For example, please see the attached letter from Vertisa, dated April 20,

2021, stating the supplier remains in "daily contact providing technical and engineering assistance" to Ecomac S.A., who is its engineering and technical liaison/representative on-the-ground in Honduras at each installation site. The supplier states that "[a]ny and all technical issues or claims that have been brought up during installations have been addressed and or resolved."[1]

Notwithstanding the foregoing, we would be remiss not to recap the following:

First, all seven (7) of the mobile hospitals and equipment ordered by INVEST-H pursuant to the terms and conditions provided for in the purchase orders, attached hereto as Exhibits C and D, were received by INVEST-H. Itemized lists of all ordered/delivered items for both the ninety-one (91) bed mobile hospitals and the fifty-one (51) bed mobile hospitals are also attached hereto as Exhibits E and F, respectively. These mobile hospitals have been or currently are being installed at sites located in:

| Site Location | # of Beds | Itemized List |
|---|---|---|
| 1. Tegucigalpa | 91 | Exhibit E, Tab A |
| 2. San Pedro Sula | 91 | Exhibit E, Tab B |
| 3. Choluteca | 91 | Exhibit E, Tab C |
| 4. Danli | 51 | Exhibit F, Tab A |
| 5. Juticalpa | 51 | Exhibit F, Tab B |
| 6. La Ceiba | 51 | Exhibit F, Tab C |
| 7. Santa Rosa | 51 | Exhibit F, Tab D |

Second, as to the delivery and installation of the mobile hospitals and equipment, we have been proactive and acted in good faith to ensure INVEST-H has been presented real solutions to problems when inquires where made, despite many times not being obligated to do so. For example, INVEST-H acknowledged, agreed to, and made assurances that upon receipt of the mobile hospitals it would honor its installation obligations pursuant to the purchase orders, which included, but were not limited to, all the necessary personnel, tools, machinery, and resources, etc., including, but not limited to, installation site readiness (which would naturally also include the connection/access of all electric and other utilities to the sites); these were and remain the obligation and duty of INVEST-H. These acknowledgements, agreements, and assurances by INVEST-H were relied and acted upon in good faith. In essence, the installation role and obligations of the supplier would only be oversight in nature. Please see Exhibit G, "Important Notes" of Purchase Order Agreement" which was included with the purchase orders. Unfortunately, the required installation readiness from INVEST-H did not materialize. INVEST-H instead subsequently requested assistance with fulfilling its installation obligations at all seven (7) sites. Ecomac S.A., the engineering and technical liaison/representatives who are on-the-ground in Honduras at each installation site, was directed to assist and help INVEST-H in compliance with said request, although there was no obligation to direct Ecomac, S.A. to do so.[2]

---

[1] See Exhibit B - Letter from Vertisa, dated April 20, 2021.

[2] It should be mentioned that INVEST-H requested for the supplier to acquire/provide the necessary personnel to install the mobile hospitals after they were received in Honduras. Assurances were made by INVEST-H that all associated costs and expenses would be reimbursed for this additional service requested by INVEST-H. INVEST-H also requested assistance with the arrangement and logistics of shipping the mobile hospitals and equipment to Honduras, which was the sole obligation of INVEST-H. Again, assurances were made by INVEST-H that reimbursement would occur after the shipments were received by INVEST-H. Accordingly, invoices for these reimbursable expenses were sent to INVEST-H, at which time the official reply was that payment would be deferred until all projects were turned over. These payment arrangements for installation and shipping for the three (3) shipments were different than originally agreed to and were unilaterally imposed by INVEST-H.

**CLAIM BY INVEST-H:**

> ***"Next, we reiterate a detail of the non-compliance and damages that we have identified to date, without prejudice that they can be expanded as more flaws are discovered."***

**RESPONSE:**

Again, we appreciate you contacting us with your concerns, and we are pleased to inform you that after reviewing your presented details of the alleged "non-compliance and damages" we understand that almost everything of what you are reporting has been addressed, corrected or is in the process of being corrected. There are a few items we need, from you, more information about; however, overall, we hope our responses are helpful in assisting you to fully utilize all seven (7) of the remarkable mobile hospitals and accompanying equipment you received from the supplier.

**CLAIM #1 BY INVEST-H:**

> ***"1. The provision of mechanical ventilators for 2 mobile hospitals with 91 beds located in the City of San Pedro Sula and Tegucigalpa. These ventilators should have been 22 for San Pedro Sula and 22 for Tegucigalpa, for a total of 44 ventilators."***

**RESPONSE TO CLAIM #1:**

Based on your claim above, the ventilators sent to San Pedro Sula and Tegucigalpa still seem to be an area of some confusion. Therefore, it is our pleasure to explain again the facts surrounding these ventilators, as we understand them. For each of these ninety-one (91) beds hospitals, Vertisa supplied twenty-two (22) new Medsan 200 Anesthesia Ventilators. Sixteen (16) Medsan 200 Anesthesia Ventilators were purchased by INVEST-H for each hospital. Six (6) additional backup Medsan 200 Anesthesia Ventilators were sent by the supplier to each hospital, free of charge, over and above the offered/ordered items.

As was global knowledge, from the beginning of the pandemic in March 2020 until the end of June 2020, there was a shortage of many immediately available essential medical devices, especially mechanical pulmonary ventilators. This worldwide shortage of ventilators was a subject of intense international discourse and known by virtually everyone in the world with access to any media reports, particularly to governmental or quasi-governmental healthcare actors. Further, since it was impossible to immediately find such medical equipment, this subject was specifically disclosed and discussed many times during numerous teleconference calls with representatives of INVEST-H, as well as other government officials, who included personnel from the Ministry of Health. The decision to have the delivered ventilators specially manufactured was approved by INVEST-H during one of these numerous teleconference calls. As was disclosed and agreed, the supplier contracted with and received the cooperation of a Turkish medical device manufacturer to supply dual use ventilators; devices that can be used as both a mechanical pulmonary ventilator for the treatment of patients that are suffering from COVID-19 and as an anesthesia device (minor compulsory equipment must be added) once the pandemic is over. Modified dual use ventilators were deemed suitable to treat COVID-19 patients by relevant governmental and non-governmental organizations. For example, the United States Food and Drug Administration ("FDA"), on March 24, 2020,

> " … issued an umbrella EUA in response to concerns about the insufficient supply and availability of FDA-cleared ventilators for use in health care settings to treat patients during the COVID-19 pandemic. This EUA authorizes the emergency use of certain ventilators, anesthesia gas machines modified for use as ventilators, positive pressure breathing devices

> modified for use as ventilators, ventilator tubing connectors, and ventilator accessories that the FDA determines meet specified criteria for safety, performance, and labeling. The devices that are eligible for inclusion under the EUA are those that are not currently marketed in the U.S., or those that are currently marketed in the U.S. but a modification is made to the device that would trigger the requirement that a manufacturer submit a new premarket notification (510(k)) to the FDA, as discussed in the agency's Ventilator Enforcement Policy."[3]

Further, the American Society of Anesthesiologists and Anesthesia Patient Safety Foundation jointly stated on May 7, 2020, "anesthesia ventilators are an obvious first-line backup during the COVID-19 pandemic when there are not sufficient ICU ventilators to meet the patient care needs."[4]

The Medsan 200 Anesthesia Ventilators specially manufactured in fulfillment of INVEST-H's orders, is based on a pulmonary mechanical ventilator; however, the casing resembles an anesthesia device.[5] The devices are both designed to be used in critical life support ventilation and surgical applications in both intensive care units and surgery rooms (minor compulsory equipment must be added). The delivered Medsan 200 Anesthesia Ventilators have all ventilation modes that are requested for treatment of a patient who is suffering from COVID-19. Please see the explanatory technical specifications prepared by the manufacturer of the Medsan 200 Anesthesia Ventilators and attached hereto as Exhibit H, confirming such.

**CLAIM #2 BY INVEST-H:**

> ***"2. 44 used anesthesia machines arrived, of which 22 are in San Pedro Sula and 22 in Tegucigalpa. These were not requested."***

## RESPONSE TO CLAIM #2:

While we respectfully direct your attention to our response in #1 above, again please note that the Medsan 200 Anesthesia Ventilator is a dual use ventilator. It can be used as a mechanical pulmonary ventilator for the treatment of patients that are suffering from COVID-19 and as an anesthesia device (minor compulsory equipment must be added) once the pandemic is over. The Medsan 200 Anesthesia Ventilator is based on a pulmonary mechanical ventilator; however, the casing resembles an anesthesia device.

**CLAIM #3 BY INVEST-H:**

> ***"3. There was no technical personnel from the supplier for the assembly and installation of all equipment and systems of mobile hospitals. This was offered by the supplier to guarantee the installation."***

## RESPONSE:

---

3 See Exhibit I - United States Food and Drug Administration. Ventilators and Ventilator Accessories EUAs. (https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/ventilators-and-ventilator-accessories-euas#accessories)

4 See Exhibit J - American Society of Anesthesiologists & Anesthesia Patient Safety Foundation. APSF/ASA Guidance on Purposing Anesthesia Machines as ICU Ventilators. (https://www.asahq.org/-/media/files/spotlight/anesthesia-machines-as-icu-ventilators-5-07.pdf?la=en&hash=164A428145ACF7B78E9F3732153C4953E3E8BE87

5 We believe that it must again be noted that all equipment and systems included with the mobile hospitals are brand new. There were no "used" items. Unfortunately, the official narrative being fed the local media outlets in this regard is false and should not be the basis of any claims between us.

Ing. Jose Ernesto Leva Bules
Ing. Jose Alberto Benitez Portillo
Ing. Jose Gustavo Boquin Suarez

From July 2020 until February 2021, commercial flights available from Turkey to Honduras were severely restricted due to the pandemic. It is also our understanding that during the same period no transit visas were issued for any person by the Embassy of the United States of America in Turkey. Therefore, no personnel from the supplier could travel to Honduras for the assembly and installation of equipment and systems of the mobile hospitals.

Fortunately, the mobile hospitals are all pre-built, pre-assembled, tested and packed in fully a functional state. Notwithstanding the relative ease associated with installation, the aforementioned installation and training is being performed by a contracted local company, Ecomac S.A. This company's personnel received professional training at the manufacturing facility in Turkey specific to these mobile hospitals, where the mobile hospital modules were completed. Ecomac S.A. is authorized and trained by the supplier and is technically capable to perform the installation procedures without the need of direct supervision by the supplier on the ground. Also, as long as the necessary connections are functioning, the installation procedures are supervised 24-hours a day/7-days a week online via internet and phone by a team of factory engineers and Ecomac S.A. personnel. Further, Ecomac S.A. has already successfully finalized the installation, training of day-to-day biomedical operational personnel, etc., and commissioning of the mobile hospitals in Tegucigalpa, San Pedro Sula since last year. It is our understanding under your instructions and approvals, Choluteca and Santa Rosa Hospitals are ready to be turn over this week. Remaining projects are nearly complete pending your inspections and approvals to turn them over. Completion, however, is dependent on INVEST-H providing the necessary local resources. The provision of necessary local resources is beyond the supplier's direction and control. Completion is solely dependent on the actions of INVEST-H.

Further, it would be remiss of us to not again note that the installation performed by Ecomac S.A. is not within the scope of the purchase orders. Please review the notes of the enclosed purchase orders (see Exhibits C and D) and the Important Notes of Purchase Order Agreement (see Exhibit G) indicating INVEST-H is responsible for supplying personnel, machinery, tools, resources, having the installation sites ready, etc. to do the installations.

## CLAIM #4 BY INVEST-H:

> ***"4. Lack of supplies for the installation of equipment and systems:***
> ***→ 2 USB sticks required by X-ray machines for the hospital of Tegucigalpa, there are three in total, only one came. These USB sticks are keys to access the equipment."***

**RESPONSE TO CLAIM #4:**

All the required USB sticks were shipped with their respective X-ray machines. The supplier is unaware of the whereabouts of any missing USB sticks and we have records of complete delivery. However, in good faith the supplier will re-ship the two (2) missing USB sticks and will waive the fees that would normally be charged for this.

**CLAIM #4 BY INVEST-H, CONTINUED:**

> ***"→ 3 hoses from the medical gas network, 1 for oxygen, 1 for vacuum and 1 for medicinal air, in the resuscitation area."***

**RESPONSE TO CLAIM #4, CONTINUED:**

It is our understanding these items have been replaced by the technical representatives of Ecomac S.A.

Ing. Jose Ernesto Leva Bules
Ing. Jose Alberto Benitez Portillo
Ing. Jose Gustavo Boquin Suarez

**CLAIM #4 BY INVEST-H, CONTINUED:**

***"→ USB cables of 5 Printers brand HP model LASER 107 of the Mobile Hospital of Tegucigalpa."***

**RESPONSE TO CLAIM #4, CONTINUED:**

IT is our understanding these items will be provided by the technical representatives of Ecomac S.A.

**CLAIM #4 BY INVEST-H, CONTINUED:**

***"→ 34 pressure gauges"***

**RESPONSE TO CLAIM #4, CONTINUED:**

Please know that this request is not within the scope of the purchase orders. All tanks came with their respective pressure valves. However, the technicians of the Catarino Rivas hospital, now responsible for the San Pedro Sula hospital, unilaterally made the decision to install another type of valve under their own responsibility and authority.

**CLAIM #4 BY INVEST-H, CONTINUED:**

***"→ 1 UV Lamp for Mobile Hospital Water Treatment Plant of Tegucigalpa."***

**RESPONSE TO CLAIM #4, CONTINUED:**

The UV lamp is not within the scope of the purchase orders. However, the supplier added one as a good faith gesture, free of change. If this item is not functioning, it will be replaced by the supplier.

**CLAIM #5 BY INVEST-H:**

***"5. Lack of technical and user manuals for systems and equipment, which must come in Spanish and / or English:***
***→ Water purification plant***
***→ Oxygen generating plant***
***→ Medicinal gas plant***
***→ Bio-infectious waste plant***
***→ Air conditioning system with HEPA filters***
***→ Generator manuals***
***→ Electrical system***
***→ Electric stove***
***→ Stationary X-ray***
***→ Portable X-rays***
***→ Secretion suckers***
***→ Chemistry analyzer (laboratory equipment)***
***→ Hematology analyzer (laboratory equipment)"***

**RESPONSE TO CLAIM #5:**

Technical and user manuals for systems and equipment were sent in digital format several times. However, please again find digital copies by accessing the following links:

https://drive.google.com/drive/folders/1VGkeAwwwzRVOU8iFSeDECw6_-T6_2x5E?usp=sharing

https://drive.google.com/drive/folders/1Yw9oocv1Z4El4Vw-gJINMx7UEwZcXhQq?usp=sharing

**CLAIM #6 BY INVEST-H:**

***"6. Lead vests and collars, for all mobile hospitals, verified in Tegucigalpa and SPS."***

**RESPONSE TO CLAIM #6:**

Lead vests and lead collars are not in the scope of the purchase orders. However, as a good faith gesture the supplier added these items, free of charge, for five (5) mobile hospitals. Unfortunately, the supplier could not send them for the mobile hospitals located in Tegucigalpa and San Pedro Sula due to pandemic-related export restrictions in place at the time. However, Ecomac S.A. has already purchased two (2) replacement lead vests and two (2) replacement lead collars from Imagenes y Fotografias de Honduras. We understand they have already been delivered to INVEST-H.

**CLAIM #7 BY INVEST-H:**

***"7. There is a missing Computer (CPU, Monitor, mouse) and printer for the computer chemistry in the laboratory area, brand BIOBASE MODEL BK 200 mini"***

**RESPONSE TO CLAIM #7:**

The BIOBASE MODEL BK 200 mini does not include a standalone computer. The supplier did send a standalone computer to be used in the laboratory, which is also suitable to be used with the chemistry analyzer.

**CLAIM #8 BY INVEST-H:**

***"8. The air conditioning system has a design deficiency, due to the fact that the condenser does not have the cooling capacity for the whole room, also the room presents problems for the negative pressure cycle to be fulfilled, which according to hospital standard should be -10pa and according to tests carried out in the wards present results from -4 to -6pa, therefore, the rooms do not comply with the tightness required to function properly."***

**RESPONSE TO CLAIM #8:**

The mobile hospitals provided by the supplier were specially designed and built for the treatment and care of patients with COVID-19 and they conform to that use. Without more specificity to this claim, a more thorough response cannot be provided at this time. We respectfully ask you to please provide us more specific details

regarding the exact hospital standards to which you are referencing, including, but not limited to, official copies (with English translations) of the scientific authorities, if any, on which you base this claim.[6]

**CLAIM #9 BY INVEST-H:**

> ***"9. UPSs were not registered within the hospitals, however according to the plan they appear included, the said electrical equipment is essential for an uninterrupted electrical flow within the hospital."***

**RESPONSE TO CLAIM #9:**

UPS systems are not within the scope of the itemized list or the purchase orders. The supplier designed the infrastructure of the electrical distribution module in such a way that, if requested by the end-user, UPS units can be added to the module without the need of making future complicated alterations/adjustments to the unit. The supplier did this with the hope of saving the end-user from future expenses should they decide to a UPS system. This topic was covered on numbers occasion during the manufacturing period with INVEST-H representatives. Therefore, this should not be considered an absence of any items.

**CLAIM #10 BY INVEST-H:**

> ***"10. Neither spare parts nor accessories were provided for the electrical, mechanical, and biomedical systems."***

**RESPONSE TO CLAIM #10:**

Spare parts and accessories for electrical, mechanical, and biomedical systems are not in the scope of the purchase orders. However, as a good faith gesture the supplier sent hundreds of thousands of United States Dollars' worth in extra spare parts (free of charge) that were not required under the purchase orders. Please check the packing lists in detail to verify and also check the extra items related to electrical, mechanical, and biomedical systems in the packing for the San Pedro Sula and Tegucigalpa mobile hospitals, on containers:

| Container # | Item # |
|---|---|
| 12 | 15 |
| 34 | 10 |
| 35 | 6 |
| 36 | 8, 11, & 12 |
| 37 | 18 & 20 |

(Note: All other mobile hospitals were sent with the same extra items but packed in different module containers.)

**CLAIM #11 BY INVEST-H:**

> ***"11. Due to a thermographic study, hot spots were detected within the inputs and outputs of the pedestal-type transformer, resulting in that due to upon overheating, there will be continuous***

[6] Note: The reason for having negative pressure inside some hospital modules is to prevent the spread of airborne infectious particles, and -5 Pa is sufficient to prevent the escape of airborne particles out of these modules.

Ing. Jose Ernesto Leva Bules
Ing. Jose Alberto Benitez Portillo
Ing. Jose Gustavo Boquin Suarez

> ***overload trips, causing material losses in biomedical equipment and shortening their effective usage time."***

## RESPONSE TO CLAIM #11:

In consultation with Ecomac S.A., it was learned thermographic analyses performed by ENEE concluded those hot areas are not critical. Therefore, we are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need more specific details from you.

**CLAIM #12 BY INVEST-H:**

> ***"12. Within the main voltage regulator of each hospital, no display screen was included for tension adjustment, which allows us to adjust the output voltage of the voltage regulator."***

## RESPONSE TO CLAIM #12:

Voltage regulators are not within the scope of the purchase orders. However, they were added as a good faith gesture by the supplier, free of charge. The output voltage of the voltage regulator is fixed at 380 volts. The purpose of the voltage regulator is supplying continuous 380v to the electrical connection and stabilizing the fluctuations in the input voltage. No adjustment should be performed, as this will harm the equipment that works with 380V. Thus, there is no need for any tension adjustment device.

**CLAIM #13 BY INVEST-H:**

> ***"13. At the Hospital of San Pedro Sula it was detected that one of the dual transfer switches was in bad condition, so it was replaced with the switch of the dual transfer of the Hospital of Choluteca, so as not to stop the operation of the facility that was already providing care."***

## RESPONSE TO CLAIM #13:

We understand a new switch was sent and will be installed in the Hospital of Choluteca by Ecomac S.A.

**CLAIM #14 BY INVEST-H:**

> ***"14. The internal coils of one of the main switches of the dual transfer were damaged, so the coils from the Hospital of Choluteca coils were used."***

## RESPONSE TO CLAIM #14:

We understand new coils were delivered to Ecomac S.A. and the installation has been completed. It is important to note that the new original coils were replaced again using new coils. It is our understanding that the burning out of the new original coils was not due to equipment failure, but instead due to electrical fluctuations in the grid. As a good faith gesture, the coils were replaced, shipped, and installed in Choluteca.

**CLAIM #15 BY INVEST-H:**

> ***"15. The times of the dual transfer within the modular hospitals amount to 45 seconds, as the UPS does not exist, the hospital is without power for 1 minute, requests to adjust said transfer to***

Ing. Jose Ernesto Leva Bules
Ing. Jose Alberto Benitez Portillo
Ing. Jose Gustavo Boquin Suarez

***shorter times."***

## RESPONSE TO CLAIM #15:

On the control panel of the electrical generator the transfer period can be adjusted to be as short as 10-15 seconds. Please consult the user manual or Ecomac S.A. to make any such adjustments.

**CLAIM #16 BY INVEST-H:**

***"16. The supports for the Choluteca and Santa Rosa generators were in poor condition."***

## RESPONSE TO CLAIM #16:

We have checked with the supplier and Ecomac S.A. and the feedback we have received is that the units are working well. Required parts were replaced using those from idle generators from different mobile hospitals. Replacement parts for the other hospital generators have been received and are being installed.

**CLAIM #17 BY INVEST-H:**

***"17. The X-ray section and the Oxygen plant do not come inside the main feeder's package, at the Hospital of Santa Rosa."***

## RESPONSE TO CLAIM #17:

We have checked with Ecomac S.A. and the feedback we received is that the oxygen generator units are working well. The X-ray system did need an electrical component, which has been sent by the supplier and will be installed by Ecomac S.A. Please know that the X-ray unit will be handed over fully functional.

**CLAIM #18 BY INVEST-H:**

***"18. Lack of architectural, plumbing and electrical network plans for the Mobile Hospitals."***

## RESPONSE TO CLAIM #18:

Architectural and electrical plans were sent in digital format several times. However, the supplier will print and send via courier.

**CLAIM #19 BY INVEST-H:**

***"19. Regarding the guarantee of medical and non-medical equipment and systems, it has not been received yet from the supplier."***

**RESPONSE TO CLAIM #19:**

We remain committed to facilitating your requests with the supplier and have made this inquiry with supplier. The supplier indicates component manufacturer warranties are passed through to INVEST-H, as end-user, as applicable/permissible by each component manufacturer and are typically twelve (12) months in duration.

Ing. Jose Ernesto Leva Bules
Ing. Jose Alberto Benitez Portillo
Ing. Jose Gustavo Boquin Suarez

It is our understanding that your letter is exhaustive of all INVEST-H claims as of March 18, 2021 and that Ecomac S.A. is working on such claims as described herein, in many occasions above and beyond what may be required. We remain at your disposal to facilitate such situations, in good faith.

**CLAIM #20 BY INVEST-H:**

***"20. Lack of architectural, plumbing and electrical network plans for Mobile Hospitals."***

**RESPONSE TO CLAIM #20:**

Please see our response to claim #18 above.

**CLAIM #21 BY INVEST-H:**

***"21. In the Modular Hospital of Tegucigalpa, 5 damaged lecterns were found, the tubes bottoms are cracked."***

**RESPONSE TO CLAIM #21:**

We understand the lecterns have been replaced by Ecomac S.A.

**CLAIM #22 BY INVEST-H:**

***"22. Tests of the oxygen generating plant were carried out to verify the operation and verify its ability to maintain oxygen concentration and working pressure, with a high demand, taking into account that the hospital has installed 88 oxygen intakes.***
***The tests consisted of connecting mechanical ventilators at a flow of 50 Lt / min and at 100% oxygen concentration:***
***By connecting 5 ventilators, it was identified that the pressure dropped from 4.5 bars to 2.5 bars and the oxygen concentration dropped from 100% to 89% during 13 hours of continuous operation, this happened as transfer tests were done with generators, in this range of hours."***
***"Whenever there is a power cut, the plant takes 20 minutes to generate oxygen again and when power is restored, the plant fails to reach the required values to continue therapy with which the ventilators were programmed initially."***
***"Tests were also made with 10 and 20 mechanical ventilators; it was identified that pressure and oxygen concentration decreased during the first 30 minutes."***
***"It is concluded that the oxygen generating plant does not have the capacity to work with high flow mechanical fans."***

**RESPONSE TO CLAIM #22:**

Please see our response to claim #1 above for background information concerning the Medsan 200 Anesthesia Ventilators.

While there are eighty-eight (88) oxygen outputs in the ninety-one (91) bed mobile hospitals, it does not mean they will be used all at full capacity, with ventilators connected, since a vast majority of admitted COVID-19 patients do not require mechanical ventilators. Also, the capacity of the oxygen generators was calculated based on the number of mechanical ventilators offered (sixteen (16) per hospital) and did not include the backup

Ing. Jose Ernesto Leva Bules
Ing. Jose Alberto Benitez Portillo
Ing. Jose Gustavo Boquin Suarez

ventilators provided free of charge (six (6) per hospital). Further, the calculations are based on scientific studies, such as the one published in the research article, "*Outcomes of mechanically ventilated patients with COVID-19 associated respiratory failure.*" In this study, scientific experts concluded that on average 16% of admitted COVID-19 patients required mechanical ventilators.[7] The offers provide the mechanical ventilators for bed ratio is 17%. However, we sent mechanical ventilators at a bed ratio of 24%. Both of which not only meet, but in fact exceed, the expectations for COVID-19 criteria.

Also, in addition to the aforementioned scientific study, on December 17, 2020 the National Institutes of Health updated its COVID-19 treatment guidelines for oxygenation and ventilation. Relevant to this topic the National Institutes of Health has concluded:

"For mechanically ventilated adults with COVID-19 and ARDS:

- The Panel recommends using low tidal volume (VT) ventilation (VT 4–8 mL/kg of predicted body weight) over higher VT ventilation (VT >8 mL/kg) (AI).
- The Panel recommends targeting plateau pressures of <30 cm H2O (AIIa).
- The Panel recommends using a conservative fluid strategy over a liberal fluid strategy (BIIa).
- The Panel recommends against the routine use of inhaled nitric oxide (AIIa)."[8]

Further, based on the scientific findings of experts from the European Union, calculations were made assuming an average (75kg) 8*75=600ml per inhalation. An average person will inhale and exhale twelve (12) times per minute, making 7.2 Lt/min. Thus, for sixteen (16) patients that equates to 115.2 Lt/min for a ninety-one (91) bed hospital. For HFNO (High Flow Nasal Oxygen) therapy, it is suggested using 55Lt/min with 65% oxygen concentration.[9] This equates to 35.75 Lt/min per patient. For sixteen (16) ventilated patients, this equates to 16*35.75Lt/min, making 572 Lt/min. Therefore, the supplied 700 Lt capacity oxygen generator meets and exceeds the projections.

These scientific studies are merely a few such examples proving the position stated herein.

**CLAIMS AND REPONSES TO OTHER MISCELLANEOUS ITEMS**

**Claim: -** "*In addition to the above, defects were found that have not allowed the proper operation of the Hospitals, so that, despite INVEST-H's efforts to start them up, they have faced difficulties due to:*
*1. Electrical:*
*a. There is no uninterrupted backup system;*"

**Response –** This was not included in the offer.

**Claim: -** "*b. There are several hot spots for potential electrical failure due to increased temperature;*"

---

[7] See Exhibit K - King CS, Sahjwani D, Brown AW, Feroz S, Cameron P, Osborn E, et al. (2020) Outcomes of mechanically ventilated patients with COVID-19 associated respiratory failure. PLoS ONE 15(11): e0242651. (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7682899/pdf/pone.0242651.pdf).

[8] See Exhibit L - National Institutes of Health, COVID-19 Treatment Guidelines. Oxygenation and Ventilation. Last updated: Dec. 17, 2020. (https://www.covid19treatmentguidelines.nih.gov/critical-care/oxygenation-and-ventilation/)

[9] See Exhibit M - Guy T, Créac'hcadec A, Ricordel C, et al. High-flow nasal oxygen: a safe, efficient treatment for COVID-19 patients not in an ICU. Eur Respir J 2020; in press (https://doi.org/10.1183/13993003.01154-2020).

**Response** –We are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

**Claim: -** *"2. Air conditioning:*
*a. Air conditioning is not met for certification;"*

**Response –** All systems were tested and run at manufacture's factory before being shipped to Honduras. We are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

**Claim: -** *"b. Orifices on false ceiling;"*

**Response –** Ecomac S.A. has fixed these issues and we have not been notified of any further issues. We are unaware of any new problems. Therefore, we are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

**Claim: -** *"c. Low negative pressure;"*

**Response -** Please see our answer to claim #8 above.

**Claim: -** *"d. Lack of pre-filters in the extraction of the system;"*

**Response -** Filters are installed in the extraction vents. We are unaware of any problem regarding the filters. Therefore, we are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

**Claim: -** *"e. Mini Split negatively alter the circulation of the particles;"*

**Response -** Mini splits were only installed in areas where the presence of COVID-19 patients is minimally foreseen. It is expected for Covid-19 patient circulation in those areas.

**Claim: -** *"f. There is no monitor to measure negative pressure;"*

**Response -** This was not included in the offer.

**Claim: -** *"g. Defective sealing in the filter mounting structure;"*

**Response -** We are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

**Claim: - "***3. Biomedical:*
*a. Oxygen purity reduction;"*

**Response** - This was not included in the offer.

**Claim: - "***b. Design of the X-ray Room does not comply with the regulations;"*

**Response -** We are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

**Claim: - "***c. Lack of X-ray room signage;"*

**Response –** This will be shipped as soon as possible.

**Claim: - "***d. Bad location of the autoclave and flow problem;"*

**Response** - We are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

**Claim: -** *"and. Lecterns in poor condition;"*

**Response** - We are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

**Claim:** - *"F. Lack of sinks."*

**Response -** The number of sinks provided was according to the offer. Please describe further.

**Claim:** - *"g. Limitations in the turn for access of stretchers;"*

**Response -** Please be aware that this is a prefabricated mobile hospital, and due to transportation limitation, the design and implementation cannot be compared to a stationary fully functional hospital where there is no restriction on space. However, all passages were designed so there will be enough space for the passage and turn of the stretchers. Currently, we are unable to respond in more detail to this claim. To assist us with evaluating your statement, we need specific details.

We appreciate you contacting us with your concerns, and always encourage you to directly reach out to us regarding any matter. In the event we cannot personally assist you, we may be able to point you in the right direction.

Ing. Jose Ernesto Leva Bules
Ing. Jose Alberto Benitez Portillo
Ing. Jose Gustavo Boquin Suarez

We reserve the right, without prejudice and in our sole discretion, to make one or more amendments to this letter to further clarify and/or expound upon any responses contained herein or on any other matter relevant to this matter.

Should you believe any of these conclusions have been reached in error, please let us know as soon as possible so that a detailed inspection may be performed by the supplier through Ecomac S.A.'s technical personnel

Respectfully submitted,

*/s/ HOSPITALESMOVILES.COM*

Encls. Exhibit A – Copy of English translated version of letter from INVEST-H, dated January 10, 2021, but received on or about March 18, 2021.

Exhibit B – Copy of Letter from Vertisa, dated April 20, 2021.

Exhibit C – Copy of Purchase Order for the purchase of two (2), ninety-one (91) bed mobile hospitals (including equipment).

Exhibit D – Copy of Purchase Order for the purchase of four (4), fifty-one (51) bed mobile hospitals and one (1), ninety-one (91) bed mobile hospital (including equipment).

Exhibit E – Itemized lists of all ordered/delivered items for the three (3), 91 bed mobile hospitals (including equipment).

Exhibit F – Itemized lists of all ordered/delivered items for the four (4), 51 bed mobile hospitals (including equipment).

Exhibit G – Important Notes of Purchase Order Agreement.

Exhibit H – Technical Specifications Excerpts from Vertisa, dated April 20, 2021- Medsan 200 Anesthesia Ventilator.

Exhibit I – United States Food and Drug Administration. Ventilators and Ventilator Accessories EUAs.

Exhibit J – American Society of Anesthesiologists & Anesthesia Patient Safety Foundation. APSF/ASA Guidance on Purposing Anesthesia Machines as ICU Ventilators.

Exhibit K – King CS, Sahjwani D, Brown AW, Feroz S, Cameron P, Osborn E, et al. (2020) Outcomes of mechanically ventilated patients with COVID-19 associated respiratory failure. PLoS ONE 15(11): e0242651.

Exhibit L – National Institutes of Health, COVID-19 Treatment Guidelines. Oxygenation and Ventilation. Last updated: Dec. 17, 2020.

Ing. Jose Ernesto Leva Bules
Ing. Jose Alberto Benitez Portillo
Ing. Jose Gustavo Boquin Suarez

Exhibit M – Guy T, Créac'hcadec A, Ricordel C, et al. High-flow nasal oxygen: a safe, efficient treatment for COVID-19 patients not in an ICU. Eur Respir J 2020.

cc: Eduardo Fernandez, Esq. (with enclosures via email only)
Charles T. Dillon, Esq. (with enclosures via email only)